Filed 10/27/22  P. v. Williams CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CAMPER WILLIAMS,<br><br>    Defendant and Appellant. | F082109<br><br>(Super. Ct. No. F20903481)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Houry A. Sanderson, Judge.

Aurora E. Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Camper Williams and Edward G. each lived in separate rooms of a garage and adjacent shed behind the residence of defendant's sister. On June 2, 2020, defendant's sister found Edward unconsciousness near his shed. Edward had been beaten with a bat, which caused a cut on his head, broken bones in his hand, and cuts on his legs. The jury convicted defendant of assault with a deadly weapon (count 1) and battery causing serious bodily injury (count 2). The trial court granted defendant's motion to strike his prior serious or violent felony conviction and sentenced defendant to the four-year upper term as to count 1 and a three-year concurrent term as to count 2.

Defendant argues that the trial court erred by (1) refusing to modify CALCRIM No. 3472 (Right to Self-Defense: May Not Be Contrived) so as to explain that he would not lose the right to defend himself if he provoked the fight or quarrel intending to use nondeadly force and his victim responded with deadly force; (2) excluding evidence of Edward's history of alcohol abuse as irrelevant when it was offered to impeach Edward's credibility and explain his memory loss or, alternatively, counsel was constitutionally ineffective in failing to proffer sufficient evidence that Edward was, in fact, an alcoholic and expert testimony to support the resulting negative effect on Edward's memory; and (3) failing to stay defendant's sentence for battery causing serious bodily injury pursuant to section 654. In supplemental briefing, defendant argues that we should remand for the trial court to resentence in light of amendments to section 1170.

## PROCEDURAL BACKGROUND

The District Attorney of Fresno County filed an information on June 26, 2020, charging defendant with assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1); count 1) and battery resulting in serious bodily injury (§ 243, subd. (d); count 2). The

---

[1] Undesignated statutory references are to the Penal Code.

information also alleged one prior "strike" conviction[2] within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).  Defendant pleaded not guilty and denied the prior serious or violent felony conviction allegation.

A jury convicted defendant of both counts on August 28, 2020, after a four-day trial.  Defendant waived his right to a jury trial and admitted his prior serious or violent felony conviction.

The trial court granted defendant's motion to strike his prior serious or violent felony conviction and sentenced him on November 6, 2020, to a term of four years as to count 1 and a concurrent term of three years as to count 2.  The trial court also ordered defendant to pay victim restitution (former § 1202.4, subd. (f)), a $1,800 restitution fine (former § 1202.4, subd. (b)), a suspended $1,800 parole revocation restitution fine (§ 1202.45), $60 in criminal conviction assessments (Gov. Code, § 70373), and $80 in court operations assessments (§ 1465.8).

Defendant timely appealed on December 1, 2020.

## FACTS

Edward became homeless after his marital separation.  Betty M., defendant's sister, allowed Edward to store his belongings in a shed in her backyard and to use her residence address as his mailing address.  For six months prior, Edward would frequent Betty's residence approximately three times a week and use her facilities to shower and wash his clothes.

On June 1, 2020, Edward walked to Betty's residence, arriving between 10:00 p.m. and 10:30 p.m.  Betty was not home but Edward used a key to enter her residence, showered, ate, and did his laundry.  Approximately two or three hours after

---

[2]     The information alleged defendant was previously convicted of assault with a deadly weapon (§ 245, subd. (a)(1)) in 2002.

3.

arriving, Edward was listening to music and folding clothes in his room in the shed in Betty's backyard. Defendant stayed in a different room.

While folding clothes, Edward heard defendant knock on their shared wall and yell for Edward to shut up. Edward attempted to avoid any problems with defendant by not responding. After closing his eyes for a little bit, Edward heard defendant knocking on his door. Defendant banged on the door "pretty hard." Edward opened the door and saw defendant carrying a baseball bat and a sword. Defendant used the bat to strike Edward on the head and Edward fell forward to the ground. Defendant hit Edward in the back of his head and inflicted a wound that bled. Edward had difficulty remembering all that transpired but recalled that he lay on the ground trying to protect himself while defendant continued to swing at him with both weapons. Edward also recalled grabbing a stick to protect himself. Defendant used the sword to strike Edward's legs, and Edward suffered cuts to his legs. Defendant also cut Edward on the forehead by striking him. Defendant continued to use the bat to strike Edward's stomach, chest, and right hand, which broke in two places.

Edward lost consciousness until Betty returned home. Betty woke Edward and called for the police and ambulance. Edward waited on the front porch until the police arrived and the ambulance took him to the hospital. While at the hospital, an officer brought defendant to Edward's room and Edward identified defendant as the individual who had beat him.

Edward testified that he did not threaten defendant with a baseball bat and was not expecting defendant when defendant banged on Edward's door. He never hit defendant with a bat or any other object. Edward did not break the window to defendant's room in the shed.

Officer Derek Evers testified that he responded to Betty's residence the morning of June 2, 2020, at approximately 4:50 a.m. He met with Edward and Betty. Evers observed Edward seated on the porch and bleeding from a laceration on his head.

4.

Edward also used a rag to cover his right hand. Evers took statements from Edward and Betty while other officers contacted defendant in the backyard. Edward told Evers that Betty was not home when Edward arrived at the residence. Edward also told Evers that he put his bike away and waited for Betty to return. Edward did not tell Evers that he used a key to enter the house. Edward told Evers that defendant hit Edward on the head while he was sitting on a chair in the backyard. Edward did not tell Evers that he was inside the shed and opened the door when defendant banged on it.

Evers participated in a search of the shed and found a wooden table leg and a metal broom handle. The broom handle was bent and had traces of a red substance. One piece of the broom handle was found inside the shed and another piece was found in the yard. Evers never located either a bat or a sword. He did see that one of the windows in the shed was broken.

The prosecution rested its case after Edward and Evers testified. Defendant testified on his own behalf. Defendant testified that he lived in the garage at the property that he co-owned with Betty. Betty and her family lived inside the house. Defendant was aware that Edward was using the shed attached to the garage to store his clothing and was not upset about it.

Defendant testified that he was collecting cans from the neighborhood in the evening on June 1, 2020. When he returned home, defendant washed his hands and entered his room. As he entered his room, defendant recalled a dispute he had with Edward the prior day. Defendant knew that Edward was home because defendant saw the light and heard Edward bang on the wall. Defendant decided to pray loudly as he grieved for his father in hopes that Edward would "accept [his] prayer." Defendant hoped that Edward would apologize for the earlier disagreement. But instead, Edward banged on their shared wall, cursed, and told defendant that he did not care that defendant's father had died. Defendant told Edward, "If you didn't care, if you want to fight, come outside and we'll fight about it."

Defendant saw Edward's door open as defendant looked out of his window. When he saw Edward go outside, defendant took three or four steps from his own door. Defendant explained, "And then, he was already there. He swung the bat, and I ducked scared for my life. And then, I grabbed my broom because I didn't know what else to do. So as I ducked I came couple of steps back. I grabbed the broom, and I went like this. It broke. It cut my finger." Defendant testified that he did not see the bat until Edward swung it, and defendant said, "No, you didn't,"[3] and ducked at the same time. Defendant claimed he was afraid for his life but was able to step back to his own door and grab the broom. Defendant testified, "In my mind I probably wanted to fist-fight, but he swiped with a bat, and I stepped back a few steps."

Defendant testified that Edward continued to swing at defendant's head and defendant still had a piece of the broom and a stick. Defendant did not remember exactly when he found the stick on the ground but estimated it was toward the middle of the fight. Defendant used the broom handle and the stick to swipe Edward's legs "hoping he would back up and at least stop." Defendant repeated that he was scared for his life because he thought that Edward would strike defendant in the head and kill him. Defendant explained that every time Edward swung the bat, defendant would crouch down and hit Edward's legs. Edward backed up to avoid defendant's attempts to strike Edward's legs. As Edward stumbled due to a hole in the ground, defendant hit Edward in the head. Defendant testified, "[O]nce I did that, okay, the fight is over with. You can not bother me no more. Leave me alone. And I ran back into my room and shut the door to my room and hold [*sic*] my door shut, because my door doesn't lock."

---

**3**     This expression is "[a] colloquial expression of incredulity, voiced upon witnessing another's action or statement, or hearing of it from the actor firsthand" (Urban Dictionary <https://www.urbandictionary.com/define.php?term=Oh%20no%20you%20didn%27t> [as of Oct. 27, 2022]) or is "[a] response to a bold statement, accusation, or action; slang for 'you're going to wish you hadn't said/done that,' or ' … you'll pay for that' " (Urban Dictionary <https://www.urbandictionary.com/define.php?term=oh+no+you+di%27int> [as of Oct. 27, 2022]).

Defendant explained that after he entered his room, he placed the stick on the refrigerator and got a drink. He continued to look out the window in hopes that Edward would stay on the ground. However, Edward rose from the ground and defendant moved to the door to hold it closed. Edward broke the window while he cursed defendant and demanded defendant come outside to fight. Edward eventually returned to his room. Defendant saw Betty arrive later but did not hear her conversation with Edward. Defendant saw Edward leave in an ambulance. Approximately 30 minutes later, defendant was arrested. Defendant told the officers that the broom and stick that he used were located in his room. He identified the photograph of the table leg and metal broom handle that he used to hit Edward.

## DISCUSSION

### I. *Defendant was not prejudiced by the trial court's failure to modify CALCRIM No. 3472 relating to contrived self-defense.*

#### A. Background

##### 1. *Jury Instruction Conference*

The trial court agreed to instruct the jury with CALCRIM No. 3471 (Right to Self-Defense: Mutual Combat or Initial Aggressor) as requested by defendant. The prosecution requested the trial court also instruct the jury with CALCRIM Nos. 3472 (Right to Self-Defense: May Not Be Contrived) and 3474 (Danger No Longer Exists or Attacker Disabled). Defense counsel requested permission to conduct follow-up research on the instruction, referencing the bench notes to CALCRIM No. 3472, which suggest "modification in the rare case in which a defendant intends to provoke only a non-deadly confrontation and the victim responds with deadly force." (Judicial Council of Cal., Crim. Jury Instns. (2020) Bench Notes to CALCRIM No. 3472, p. 1009.) Defense counsel explained that the evidence showed that defendant invited Edward to a fist fight and Edward responded with the use of a bat. The trial court explained that it believed the suggested modification would only apply when defendant has communicated or

7.

demonstrated to the victim that he only intends to provoke a nondeadly confrontation. However, the trial court agreed to permit the parties time for additional research and agreed to revisit the issue the following day.

Revisiting the issue the next day, the trial court found that the instruction was supported by substantial evidence. However, the trial court did not address defendant's earlier request to modify the language in light of Edward's use of deadly force in response to defendant's invitation to fist fight. The trial court did, however, recognize that "[i]t could certainly be an argument by the People if they believed [defendant]'s use of force beyond that of a regular fist fight that he supposedly had intended, or any fight, then they can use that to negate [the self-defense] elements in the instructions." The trial court warned the prosecutor that "[i]t doesn't take away from the People's obligation to show that [defendant] did not act in self-defense" and to "be aware that you cannot negate—you cannot take away an element from the crimes of the charges that you have to prove just because this instruction is being given."

### 2.    *Instructions to the Jury*

The trial court instructed the jury with modified versions of CALCRIM Nos. 3470 (Right to Self-Defense or Defense of Another (Non-Homicide)) and 3471 (Right to Self-Defense:  Mutual Combat or Initial Aggressor) as follows:

> "A person who engages in mutual combat or who starts a fight has a right to self-defense only if:  One, he actually and in good faith tried to stop fighting; two, he indicated by word or by conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting; and that he had stopped fighting; and three, he gave his opponent a chance to stop fighting.  If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.  However, if the defendant used only non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try [to] stop fighting, communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting.

8.

> "A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

The trial court also instructed the jury with unmodified CALCRIM No. 3472 (Right to Self-Defense: May Not Be Contrived):

> "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." (CALCRIM No. 3472)

### 3. *Closing Arguments*

The prosecutor relied upon Edward's testimony to argue that defendant did not act in self-defense. Edward testified that defendant hit Edward in the head with a bat after he opened the door when defendant knocked. Edward did not have a weapon initially, and defendant repeatedly hit Edward with a bat and sword. The prosecutor argued that defendant was not in imminent danger as he was the aggressor in the altercation and struck Edward, who was unarmed. The prosecutor did not argue that defendant did not have a right to self-defense because he provoked the fight with the intent to create an excuse to use force.

Defense counsel argued that Edward should not be believed because he testified inconsistently with the statement he had provided to the police at the time of the assault, Edward accepted defendant's invitation to fight but then attacked defendant with a bat (placing defendant in imminent danger), and defendant responded with no more force than needed. Defense counsel reviewed the jury instruction regarding contrived self-defense and argued that it was applicable only where defendant provoked Edward to fight because defendant wanted Edward to hit first so that defendant could claim self-defense. Defense counsel argued that defendant wanted to fight Edward but not with the intent to claim self-defense.

The prosecutor responded to defense counsel's arguments by urging the jury to believe Edward's version of events and emphasizing that Edward did not attack

9.

defendant and would not have risked his only housing by fighting with defendant. Furthermore, the prosecutor pointed out that Edward was severely injured while defendant only had a cut on his hand and indicated that defendant was not acting in self-defense. The prosecutor concluded that the evidence proved that defendant was the aggressor and hit Edward in the head with a bat when Edward opened the door. The prosecutor did not argue that defendant lost his entitlement to self-defense because he provoked a fight or quarrel in order to establish a claim of self-defense.

## B. Applicable Law and Standard of Review

We review de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) When reviewing a purportedly ambiguous or misleading instruction, we inquire whether there is a reasonable likelihood the jury applied it in a way that violates the United States Constitution. (*People v. Boyce* (2014) 59 Cal.4th 672, 714.) We consider the instructions as a whole, as well as the entire record of the trial, including the arguments of counsel. (*People v. O'Malley* (2016) 62 Cal.4th 994, 991.) We presume that the jurors are intelligent persons, capable of understanding and correlating the instructions given. (*Ibid*.; *People v. Gonzales* (2011) 51 Cal.4th 894, 940.) Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation. (*People v. McPheeters* (2013) 218 Cal.App.4th 124, 132.)

" '[S]elf-defense is not available as a plea to a defendant who has sought a quarrel with the design to force a deadly issue and thus, through his fraud, contrivance or fault, to create a real or apparent necessity for making a felonious assault.' " (*People v. Hinshaw* (1924) 194 Cal. 1, 26 (*Hinshaw*).) " 'We have explained that "the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created

10.

circumstances under which his adversary's attack or pursuit is legally justified." ' "
(*People v. Enraca* (2012) 53 Cal.4th 735, 761.)

Defendant argues that CALCRIM No. 3472 instructed the jury that defendant did not have a right to self-defense if contrived to excuse the use of any amount of force. Relying on *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*), defendant argues that the trial court erred when it failed to modify CALCRIM No. 3472 to clarify that defendant would not lose the right to self-defense if he provoked a fight only with the intent to use nondeadly force and Edward countered with deadly force.[4] The People respond that substantial evidence did not support modification of the instruction because the only evidence was defendant's "self-serving testimony."[5] We do not agree that the trial court's instructions to the jury would have been interpreted to defeat defendant's self-defense claim if he only intended to fight using nondeadly force and, even if the instruction was ambiguous, any error in this case is harmless.

---

[4]     Defendant suggests, in a footnote, that CALCRIM No. 3472 is only applicable in cases where deadly force has resulted in the victim's death. We reject this claim in light of our Supreme Court's recognition that the jury instruction in a case charging only assault with force likely to cause great bodily injury "correctly states the recognized principle of law 'that self-defense is not available as a plea to a defendant who has sought a quarrel with the design to force a deadly issue and thus, through his fraud, contrivance or fault, to create a real or apparent necessity for making a felonious assault.' " (*Hinshaw*, *supra*, 194 Cal. 1 at p. 26 [the defendant claimed self-defense after breaking victim's jaw]; see also *People v. Duchon* (1958) 165 Cal.App.2d 690, 693 ["The plea of self-defense is not available to one who has sought a quarrel with the design or apparent necessity for making an assault."]; *People v. Garcia* (1969) 275 Cal.App.2d 517, 523 ["A man has not the right to provoke a quarrel, go to it armed, take advantage of it and then convert his adversary's lawful efforts to protect himself into grounds for further aggression against him under the guise of self-defense."].)

[5]     We do not address the People's argument in light of our alternate resolution of the issue but note that "[i]n determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982.) Defendant's testimony suffices to warrant the trial court's consideration of the requested modification.

11.

### C. Analysis

#### 1. *The trial court did not err in its instructions to the jury.*

As explained in *People v. Eulian* (2016) 247 Cal.App.4th 1324, the California Supreme Court has held the language in CALCRIM No. 3472 is a generally correct statement of law. (*Eulian*, at p. 1333.) "In *People v. Enraca*[, *supra,*] 53 Cal.4th [at p.] 761 … , our Supreme Court explained that the self-defense doctrine 'may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified.' In *Enraca*, 'the trial court instructed the jury on the law as we have just explained it. It gave CALJIC No. 5.55: "The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense." ' [Citation.] While *Enraca* involved the CALJIC analog to CALCRIM No. 3472, the language of the two instructions is materially the same. CALCRIM No. 3472 is therefore generally a correct statement of law." (*Ibid*., citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction."]; see *Hinshaw*, *supra*, 194 Cal. 1 at p. 26.)

The trial court instructed the jury with the identical language found in CALCRIM No. 3472. It read: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." "By its express language, CALCRIM No. 3472 does not apply to every person who initiates a fight and subsequently claims self-defense. Instead, it applies to a subset of individuals who not only instigate a fight, but do so with the specific intent that they contrive the necessity for their acting thereafter in 'self-defense,' and thus justify their further violent actions. In other words, this instruction applies, and the right to self-defense is lost, only if an initial aggressor commences combat for the intended purpose of provoking a violent reaction so that he or she can then retaliate with further violence, whether deadly force or

12.

nondeadly force, under the guise of self-defense. The defendant's intent is measured at the time the fight or quarrel is provoked." (*Ramirez*, *supra*, 233 Cal.App.4th 940, 954 (dis. opn. of Fybel, J.).)

In challenging this conclusion, defendant relies on *Ramirez*, in which a divided panel concluded that under the facts of that case, CALCRIM No. 3472 misstated the law by effectively advising the jury "that one who provokes a fistfight forfeits the right of self-defense if the adversary resorts to deadly force." (*Ramirez*, *supra*, 233 Cal.App.4th at p. 947.) In *Ramirez,* defendants sought out rival gang members for a fight. (*Id*. at p. 944.) A fight broke out and one of the rival gang members raised his hand, holding an object that looked like a gun. (*Id*. at p. 945.) One of the defendants pulled a gun from his pocket and shot the rival gang member. (*Ibid*.) The trial court instructed the jury on mutual combat and contrived self-defense using CALCRIM Nos. 3471 and 3472. (*Ramirez*, at pp. 945–946.) In closing argument, the prosecutor invoked CALCRIM No. 3472 and misstated the self-defense law, arguing that a defendant's intent to provoke a fight of any kind barred any self-defense claim. (*Ramirez*, at pp. 943, 946–949.) *Ramirez* found that CALCRIM No. 3472 in conjunction with the prosecutor's argument deprived the defendants of their self-defense theory because if the defendants intended to start a nonlethal fight, they still had the right to defend themselves when the victims responded with lethal force. (*Ramirez*, at pp. 947–948.)

However, we do not agree that the instructions would have been understood in this manner in this case. The instructions must be examined as a whole and we must presume the jury correlated the instructions. (See *People v. Houston* (2012) 54 Cal.4th 1186, 1214, 1229.) In *Ramirez*, Justice Richard D. Fybel concluded in his dissent that a reasonable juror would not have interpreted CALCRIM No. 3472 in such a manner, particularly because the instruction applies only in a narrow set of circumstances when the defendant provokes the fight for the purpose of triggering the defendant to use force, and the trial court specifically instructed the jury with the mutual combat instruction

13.

(CALCRIM No. 3471) that specifically provided that a defendant who intends only nondeadly force retains a self-defense right if the victim responds with deadly force. (*Ramirez*, *supra*, 233 Cal.App.4th at pp. 954–957 (dis. opn. of Fybel, J.).) We agree that under the facts of this case, the jury would not have interpreted CALCRIM Nos. 3471 and 3472 in such a way as to deny defendant the right to self-defense completely just because he invited defendant to fight.

If the jury believed Edward's testimony, defendant could not claim self-defense under any circumstances. Edward testified that he was in his shed and had not responded to defendant's attempts to engage him in conversation through the wall. According to Edward, defendant knocked on the door and hit him on the head with a bat when Edward answered the door even though Edward did not have a weapon and had not attempted to hit defendant. If the jury believed Edward, defendant did not have a right to self-defense at all because defendant could not believe that he was in imminent harm of suffering serious bodily injury or being touched unlawfully.

CALCRIM Nos. 3471 and 3472 would only come into play if the jury disbelieved Edward and believed defendant. Defendant admitted during his testimony that he challenged Edward to a fist fight after exchanging words with Edward while both were still inside their respective rooms. Therefore, if the jury believe defendant's testimony, the jury would have concluded that defendant either started the fight or was engaged in mutual combat with Edward and would apply CALCRIM No. 3471 to determine when a defendant who started a fight or engaged in a fight by mutual consent is entitled to claim self-defense. Thus, the jury would only consider CALCRIM No. 3742 if it first determined that defendant had a right to self-defense pursuant to CALCRIM No. 3471.

CALCRIM No. 3471 provides that defendant, engaged in mutual combat or the initial aggressor in a fight, would have had a right to self-defense in two circumstances. First, defendant would have had a right to defend himself if he tried to stop fighting, indicated to Edward that he had stopped fighting, and gave Edward an opportunity to stop

14.

fighting. The evidence is undisputed that this did not occur. The second way for defendant to acquire the right to self-defense was if he only used nondeadly force and Edward "responded with such sudden and deadly force that the defendant could not withdraw from the fight." (CALCRIM No. 3471.) If the jury concluded that defendant used only nondeadly force and that Edward's use of the bat was deadly force, then the jury would have concluded that defendant had a right to self-defense if defendant could not withdraw from the fight. If the jury drew that conclusion, only then would it need to have considered CALCRIM No. 3472.

Applying CALCRIM No. 3472, the jury would have only rejected defendant's claim of self-defense despite Edward's use of deadly force if it also concluded that defendant used the invitation to a fist fight as an excuse to use deadly force (the weapons being the wooden table leg and metal broom stick). In other words, the jury would have had to believe that defendant challenged Edward to a fist fight with the intent to provoke Edward to use deadly force so defendant could use deadly force and use Edward's actions as an excuse to claim self-defense. Hence, if defendant simply invited Edward to a fist fight using nondeadly force, did not have the intent to use deadly force all along, did not contrive the fight in order to create an excuse to use deadly force, and then excused his use of deadly force by claiming self-defense, the jury instructions did not preclude the jury from crediting defendant's claim that he responded to Edward's use of deadly force in self-defense. We cannot conclude that the jury would have interpreted CALCRIM No. 3472 to preclude defendant from defending against deadly force just because he had challenged Edward to a fight believing that they would only use nondeadly force.

In this case, defendant testified that he invited Edward to a fist fight, which is a use of nondeadly force in most cases. Defendant testified that he did not leave his room with a weapon. The jury would not have interpreted CALCRIM No. 3472 to preclude self-defense for defendant's initial invitation to fight because CALCRIM No. 3471 very clearly told the jury that defendant did not have a right to self-defense in this context.

15.

Therefore, defendant could not have used his initial invitation to fight as an excuse to claim self-defense because he had no right to self-defense in these circumstances. CALCRIM No. 3472 would have had no application in this context. Furthermore, defendant testified that he challenged Edward to fight, intended to engage in a fist fight, and clearly acknowledged his intent to use nondeadly force. He did not make a claim of self-defense to excuse his challenge to Edward to fight. The jury could not have applied CALCRIM No. 3472 to deprive defendant of a right to self-defense when defendant did not attempt to use self-defense as an excuse to engage in a fist fight with Edward; CALCRIM No. 3472 would only have been used by the jury to determine whether defendant challenged Edward to a fist fight (a use of nondeadly force) with the intent to actually use deadly force during the altercation while claiming that he needed to defend himself against Edward's use of deadly force.

We have explained that the model instructions themselves correctly explained the law of mutual combat and contrived self-defense and conclude that no further modification of CALCRIM No. 3472 was necessary under the facts of this case. Unlike the prosecutor in *Ramirez*, the prosecutor here did not mention CALCRIM No. 3472 or its legal principles at all. Rather, the prosecutor here argued that defendant lied and attacked an unarmed Edward with a bat only after Edward opened the door when defendant knocked. The prosecutor's argument did not negate CALCRIM No. 3471's instruction that defendant had a right to self-defense if he could not retreat and Edward escalated the fight by using deadly force because the prosecutor never argued that Edward and defendant were engaged in mutual combat.

Additionally, defense counsel correctly argued this legal principle to the jury. Admitting that defendant and Edward were engaged in mutual combat, defense counsel argued that defendant candidly admitted that he wanted to fight Edward and had invited Edward to fight. Edward accepted the invitation and used a bat to try to hit defendant. Defendant believed that he was in imminent danger from the bat and grabbed a similar

16.

object, using no more force than was reasonable to respond to Edward's attack with a bat. Defense counsel argued that defendant was looking for a fist fight but Edward used deadly force, so defendant had the right to defend to himself against that force and that defendant only used a reasonable amount of force because he stopped after he hit Edward once, knocking him to the ground. Defense counsel argued that defendant did not provoke the fight with the intent to excuse his use of force as defendant admitted that he wanted a fist fight and wanted to use force. However, defendant did not provoke Edward to a fist fight with the intent to use self-defense to excuse defendant's use of deadly force. Defense counsel argued that "the key word is with the intent" and defendant admitted he wanted the fight and did not intend to claim self-defense as an excuse for the fist fight. Defendant only resorted to deadly force because Edward escalated the level of force by using a bat and did not otherwise intend to do so until Edward used deadly force.

Defense counsel's argument properly presented the legal issue of contrived self-defense to the jury and the prosecutor never raised it at all. Accordingly, there was no instructional error and *Ramirez* does not compel reversal.

### 2. *Harmless error.*

Even if we concluded that the jury instructions on self-defense were erroneous, we cannot set aside a judgment on the basis of instructional error unless, after an examination of the entire record, we conclude that the error has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) Defendant and the People disagree as to the appropriate standard for assessing prejudice. Defendant argues the assumed error in instructing with CALCRIM Nos. 3471 and 3472 violated his federal constitutional rights to present a defense and to prove beyond a reasonable doubt of every element of the crime (specifically, the absence of self-defense) such that the harmless-beyond-a-reasonable-doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) applies. The People recognize that the Courts of Appeal are not in agreement (Compare *People v. Villanueva* (2008) 169 Cal.App.4th 41, 53 [error on failing to

17.

instruct on self-defense subject to *People v. Watson* (1956) 46 Cal.2d 818 harmless error standard] with *Ramirez*, *supra*, 233 Cal.App.4th at p. 953 [applying *Chapman* standard to failure to modify CALCRIM No. 3472]) but argue the error is harmless even under *Chapman*'s more stringent harmless error standard. We agree.

Under the *Chapman* standard, we "must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt* (2017) 2 Cal.5th 819, 831; see *Neder v. United States* (1999) 527 U.S. 1, 9–10, 15–16; *Chapman*, *supra*, 386 U.S. at p. 24.) "[I]n order to conclude that an instructional error ' "did not contribute to the verdict" ' within the meaning of *Chapman* [citation] we must ' "find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record" ' [citation]." (*People v. Brooks* (2017) 3 Cal.5th 1, 70.)

Defendant argues that CALCRIM No. 3472, without modification, permitted the jury to reject his claim of self-defense because he challenged Edward to fight. As we explained, because defendant was either the initial aggressor or engaged in a mutual combat, CALCRIM No. 3471 instructed that defendant only had the right to claim self-defense if he either (1) stopped fighting, communicated his intent to stop fighting, and gave Edward a chance to stop fighting, or (2) used only nondeadly force and Edward used such sudden and deadly force that defendant could not withdraw from the fight. Defendant never testified that he tried to stop fighting, communicated his intent to Edward, or gave Edward a chance to stop fighting. Defendant testified that he "probably" intended a fist fight when he challenged Edward to a fight, did not see the bat until Edward swung it at him, said, "No, you didn't," and grabbed a metal broom stick in response. However, defendant never testified that Edward's use of the bat was so sudden and deadly that defendant "could not withdraw from the fight" (CALCRIM No. 3471).

Rather, defendant testified that he backed up three to four steps away from Edward, reached inside the open door to his room and pulled out a metal broom handle to

use as a weapon. Defendant never testified that he either wanted to, or attempted to, withdraw from the fight with Edward. Defendant's response to Edward's use of deadly force ("No, you didn't") did not express fear, but rather "incredulity" and possibly even "you're going to wish you hadn't said/done that'" or "you'll pay for that." Defendant's testimony establishes that he had an opportunity to withdraw from the fight when he returned to his room and could have closed the door to protect himself from Edward. No juror would have failed to recognize that defendant could have withdrawn from the fight and retreated to his room when he described how, instead, he reached into his room to retrieve the metal broom stick and used it to hit Edward. With the opportunity to withdraw from the fight and failure to do so, a jury would not have found that defendant reclaimed his right self-defense after challenging Edward to the fight and engaging in mutual combat regardless of any error in CALCRIM No. 3472.

We conclude, therefore, that any error in failing to modify CALCRIM No. 3472 was harmless beyond a reasonable doubt and the instruction did not affect the verdict.

## II.     *The trial court did not abuse its discretion in excluding evidence of Edward's past alcoholism.*

### A.     Background

During cross-examination of Edward, defense counsel asked Edward about his doctor visit approximately two weeks after the incident. Defense counsel asked, "And you told the doctor—admitted to the doctor that you—the doctor on that date asked you about your alcohol use?" The prosecutor objected to the question, stating it lacked foundation and was not relevant. The trial court sustained the objection and struck the question. Defense counsel asked to be heard and the trial court responded, "Not what he discussed with the doctor that night—or that two weeks later." Defense counsel again questioned Edward regarding his statements to the doctor, the prosecutor objected, and the trial court asked the parties for a side bar. Returning from side bar, the trial court sustained the objection. Defense counsel then asked, "[Edward], were you intoxicated on

19.

that night?"  Edward answered, "I may have drank a beer or two, yes."  Defense counsel announced he had no further questions.

The trial court later placed the side bar discussion on the record:

"THE COURT:  … I believe the first [side bar] was soon after [defense counsel] asked some questions about [Edward] having discussed his long-standing alcoholism with the doctor [a] couple [of] weeks after the incident that he had been taken to the hospital.  There was an objection and side bar.

"[Defense counsel], you explained that [Edward] had shared with the doctor that he is a long-time user and possibly abuser of alcohol on that appointment two weeks after the incident in question; correct?  You're nodding.

"[DEFENSE COUNSEL]:  Yes.  Sorry.

"THE COURT:  And the People objected, obviously, to that question as being relevant.  The Court agreed that it's not relevant and that you may inquire of the witness if on the date in question, the evening or late hours of the night of the 2nd of June, if he was intoxicated or had been drinking, and then, take it from there.  When you did ask of [Edward] that question after we returned to the courtroom, he admitted that he had two or three or so alcoholic beverages.  And then, I believe that was the last of your questions altogether for [Edward]

"Any further comments on that side bar discussion, [defense counsel]?

"[DEFENSE COUNSEL]:  No, Your Honor.

"THE COURT:  [Prosecutor]?

"[THE PROSECUTOR]:  No, Your Honor."

Defendant argues that the trial court abused its discretion and violated his right to confront his accusers when it precluded defense counsel from questioning Edward regarding his statements to a doctor, two weeks after the incident, that Edward was a longtime user and possibly abuser of alcohol.  The trial court ruled that the information

20.

was not relevant. We conclude the trial court did not abuse its discretion in determining that this evidence was irrelevant.[6]

## B. Applicable Law and Standard of Review

" 'The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." This federal constitutional right to confront adverse witnesses in a criminal prosecution applies to the states [citation] and is also guaranteed independently by the California Constitution (Cal. Const., art. I, § 15) and by statute (§ 686).' " (*People v. Wilson* (2008) 44 Cal.4th 758, 793, second bracketed insertion added.) Trial judges retain " 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 705, quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679–680; see *People v. Jennings* (1991) 53 Cal.3d 334, 372.)

A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) As explained below, we find no abuse of discretion in the trial court's rulings.

## C. Analysis

Defendant argues that the evidence Edward told his doctor that he had been abusing alcohol for a long time was relevant to Edward's memory loss and would have

---

[6] The trial court granted defendant's motion to exclude evidence that Edward's memory loss was attributable to either injuries from the incident or medication prescribed for those injuries without a proper medical foundation.

21.

supported an argument that Edward lost consciousness because of his alcohol abuse and not because of the altercation.

In the context of alleged drug use, our high court has explained, "Evidence of a witness's drug use is inadmissible unless the testimony 'tends to show that the witness was under the influence thereof either (1) while testifying, or (2) when the facts to which he testified occurred, or (3) that his mental faculties were impaired by the use of such narcotics.'" (*People v. Panah* (2005) 35 Cal.4th 395, 478.) However, "[e]vidence of habitual narcotics or alcohol use is not admissible to impeach perception or memory unless there is expert testimony on the probable effect of such use on those faculties." (*People v. Balderas* (1985) 41 Cal.3d 144, 191–192, superseded by statute on other grounds as stated in *People v. Martin* (1998) 64 Cal.App.4th 378, 385; see *People v. Wilson*, *supra*, 44 Cal.4th at p. 794.) The defense offered no such expert testimony.

Therefore, to the extent the trial court's evidentiary ruling encompassed a prohibition on questions regarding Edward's general long-term alcohol abuse, the ruling was proper. As noted, defense counsel was permitted to question Edward regarding his alcohol use before the altercation and presumably defendant could have testified as to whether Edward was inebriated during the altercation. Because the evidentiary ruling was proper, there is no error on which to base any constitutional claims. (See *People v. Panah*, *supra*, 35 Cal.4th at p. 478 ["Because the trial court's ruling was proper, 'there is thus no predicate error on which to base the constitutional claims.'"].)

Defendant did not cite the authorities we discussed above. Defendant's authorities are not on point and only tangentially address a witness's drug and alcohol use. (See *People v. Jones* (2013) 57 Cal.4th 899, 923 [affirming denial of dismissal motion for prearrest delay where witness's memory loss attributed to drug use and not time]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1292 [addressing § 1237 permitting admission of a statement as past recollection recorded and, in fn. 32, describing the defendant was permitted to cross-examine a witness based upon his use of memory-affecting drugs],

abrogated on another ground in *People v. Merritt, supra*, 2 Cal.5th at p. 831; *People v. Juarez* (1968) 258 Cal.App.2d 349, 358, fn. 3 [describing expert witness's testimony ruling out that the defendant suffered from alcoholic paranoia and hallucinations].) None of the cases cited by defendant address, however, the foundation necessary for presenting testimony of long-term drug or alcohol abuse or whether a trial court abused its discretion by admitting or excluding such evidence. "Because ' " 'cases are not authority for propositions not considered,' " ' " defendant's cases do not support admission of the testimony in this case. (*People v. Baker* (2021) 10 Cal.5th 1044, 1109.)

Defendant also argues that counsel was ineffective in failing to adequately argue the admissibility of the excluded evidence. "In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance." (*People v. Mickel* (2016) 2 Cal.5th 181, 198, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–692.) "To demonstrate deficient performance, defendant bears the burden of showing that counsel's performance ' " ' "fell below an objective standard of reasonableness … under prevailing professional norms." ' " ' [Citation.] To demonstrate prejudice, defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*Mickel*, at p. 198.)

"[C]ertain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding." (*People v. Mickel, supra*, 2 Cal.5th at p. 198.) "The record on appeal may not explain why counsel chose to act as he or she did. Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*Ibid.*) "Moreover, we begin with the presumption that counsel's actions fall within the broad range of reasonableness, and

afford 'great deference to counsel's tactical decisions.' [Citation.] Accordingly, [the California Supreme Court] ha[s] characterized defendant's burden as 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' for an action or omission." (*Ibid.*)

In this case, the record is inadequate for us to assess defense counsel's effectiveness in arguing for the admission of this evidence because the argument was not transcribed and the trial court's restatement of the discussion is highly abbreviated. Furthermore, in light of the law requiring expert testimony regarding the effect of alcohol on memory, any argument of counsel was likely to be unsuccessful if expert testimony was not being offered. There is no affirmative evidence that counsel lacked a rational, tactical purpose for not offering expert evidence, and the record on appeal in this case does not explain why counsel chose to act as he did. The facts associated with Edward's past history of alcohol abuse are not in the record and would have affected defense counsel's decision as to whether to offer additional evidence on the issue. As the record is silent, we decline to address defendant's ineffective assistance claims. Defendant may raise any such issue in the context of a habeas corpus proceeding.

We conclude that the trial court did not abuse its discretion in excluding evidence of Edward's past history of alcohol abuse.

### III.    *New sentencing legislation does not require remand.*

#### A.    **Background**

The probation officer's report described defendant's four prior convictions: (1) corporal injury on a spouse or cohabitant (§ 273.5, subd. (a)) in 2000, resulting in a sentence of three years on formal probation; (2) assault with a deadly weapon (§ 245, subd. (a)(1)) in 2002, resulting in a sentence of 298 days in jail and three years on formal probation; (3) disturbing the peace by fighting (§ 415, subd. (1)) in 2013, resulting in a

one-year conditional sentence; and (4) forging or altering a vehicle registration (Veh. Code, § 4463, subd. (a)) in 2018, resulting in a two-year conditional sentence.[7] The probation officer reported no factors in aggravation relating to the crime but reported the following aggravating factors relating to defendant: (1) defendant engaged in violent conduct which indicated a serious danger to society; and (2) defendant's prior convictions as an adult are numerous and of increasing seriousness. The probation officer found no mitigating factors as to either the crime or defendant.[8]

The penalty for both counts 1 and 2 was a prison term of two, three, or four years. (See §§ 245, subd. (a)(1), 243, subd. (d).) Because defendant admitted to having a prior serious or violent felony conviction (assault with a deadly weapon in 2002), section 667, subdivision (e) doubled the prison term for both counts to four, six, and eight years. The probation officer recommended the middle term of six years.

In ruling on defendant's motion to strike his prior serious or violent felony conviction, the trial court recognized that defendant's conviction was almost 19 years old and that he successfully completed his probation term received in 2002. The trial court recognized the 2013 and 2018 convictions but did "not find those to be such that they continue to show an increase in criminality." The trial court concluded that defendant did not fall squarely within the "Three Strikes" law and granted defendant's motion to strike his prior serious or violent felony conviction.

The trial court sentenced defendant to the middle term of three years for battery causing serious bodily injury (count 2), to be served concurrently to the upper term of four years for assault with a deadly weapon (count 1). In selecting the upper term, the trial court took into consideration that defendant "committed his second and third felony

---

[7] According to the probation officer's report, defendant's only felony conviction was the 2002 assault with a deadly weapon.

[8] The court also ascertained that defendant received a full psychological evaluation, which established that he did not suffer from either mental illness or substance abuse.

violations" and stated, "[T]he conduct certainly was egregious but not just based on conduct itself," placing "value on the fact that [defendant] did not stay free from criminal behavior since 2002, although" not "egregious enough to deny … the *Romero*[9] motion." (Italics added.)

### B.    Analysis

#### 1.    Section 654.

Defendant argues that the trial court erred in imposing a concurrent term on count 2 because his conviction on both counts arose from the same criminal acts. Section 654 provides that an act or omission punishable in different ways by different provisions of law shall not be punished under more than one provision.  (§ 654, subd. (a).)  The People agree that defendant's sentence on one of the counts should be stayed.

At the time of defendant's sentencing and when the parties' filed their briefs in this case, former section 654, subdivision (a) required the trial court to punish defendant in accordance with the provision that provided for the longest potential term of imprisonment.  Based on former section 654, the People argued that remand was unnecessary as we should stay the lesser three-year term on count 2.  However, effective January 1, 2022, Assembly Bill No. 518 (2021–2022 Reg. Sess.) amended section 654 to provide the trial court with the discretion to choose the count for which it would impose punishment and is no longer required to select the longer term.  (Stats. 2021, ch. 441, § 1.)

Under *In re Estrada*, (1965) 63 Cal.2d 740, "[w]hen the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not final on the statute's operative date."

---

**9**    *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 504.

(*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted.) This presumption extends to amendments providing trial courts discretion to impose lesser punishment at sentencing. (*People v. Jones* (2022) 79 Cal.App.5th 37, 45 [applying presumption to Sen. Bill No. 567 (2021–2022 Reg. Sess.) & Assem. Bill No. 518 (2021–2022 Reg. Sess.)].) Nothing in Assembly Bill No. 518 suggests legislative intent that the amendments apply prospectively only, and defendant's case is not yet final.

Although the parties have submitted supplemental briefing on whether remand is necessary in light of the applicability of other sentencing amendments, they have not addressed the necessity of remand in light of the new discretion afforded to the trial court in selecting the count on which to stay sentencing pursuant to amended section 654.

The California Supreme Court has held, when a court is unaware of the scope of its discretionary powers, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) However, "[w]e are not required to remand to allow the court to exercise its discretion if 'the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not [have imposed a different sentence]' even if it had the discretion." (*People v. Jones* (2019) 32 Cal.App.5th 267, 272–273.) "The trial court need not have specifically stated at sentencing it would not [have sentenced defendant differently] if it had the discretion to do so. Rather, we review the trial court's statements and sentencing decisions to infer what its intent would have been." (*Id*. at p. 273; see *People v. McVey* (2018) 24 Cal.App.5th 405, 419 [no remand where, "[i]n light of the trial court's express consideration of the factors in aggravation and mitigation, its pointed comments on the record, and its deliberate choice of the highest possible term for the firearm enhancement, there appears no possibility that, if the case were remanded, the trial court would exercise its discretion to strike the enhancement altogether"].)

In this case, we conclude that remand would be an idle act.  (See *People v. Flores* (2020) 9 Cal.5th 371, 432.)  The trial court struck defendant's prior serious or violent felony conviction, yet sentenced defendant to the upper term on count 1.  The trial court's sentencing comments suggest that the court viewed defendant's prior serious or violent felony conviction as too old to justify a sentence under section 667, subdivision (e) but believed that the conviction, along with other nonserious and nonviolent convictions incurred since the original conviction, justified an upper term sentence as to count 1.

At the time of sentencing, the trial court had complete discretion to select either a low or middle term but still chose the upper term.  While the trial court then sentenced defendant to the middle term on count 2, we do not ascribe significance to the selection of a term lower than that imposed on count 1 where, by imposing the term concurrently, it would not affect the overall length of the sentence.  Therefore, the trial court's sentencing choices establish that it selected an upper term sentence despite its discretion not to do so and, therefore, the trial court would not exercise its new sentencing discretion pursuant to section 654 to choose to stay the three-year term on count 2.

Therefore, we conclude the trial court erred in failing to stay the sentence for either count 1 or count 2.  However, remand is not necessary because the trial court's sentencing choices indicate that it would stay count 2, and we will amend the judgment accordingly.

### 2.    *Section 1170.*

Effective January 1, 2022, Senate Bill No. 567 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3) and Assembly Bill No. 124 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 695, § 5) amended section 1170 in two respects that are relevant here.  First, a court must "order imposition of a sentence not to exceed the middle term," except under narrow circumstances.  (§ 1170, subd. (b)(1).)  An upper term may be imposed when justified by aggravating circumstances and the facts underlying those circumstances have been stipulated to by the defendant or found true by a jury or by the judge in a court

trial. (*Id*., subd. (b)(2).)  However, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury."  (*Id*., subd. (b)(3).)

Here, defendant was sentenced to the upper term on count 1 because he had one prior serious or violent felony (admitted to by defendant after waiving a jury trial), defendant's conduct was egregious, and defendant "did not stay free of criminal behavior since 2002."  Therefore, in part, the upper term sentence was not based on "facts … stipulated to by the defendant, or … found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial," as required under the amended statute.  (§ 1170, subd. (b)(2).)[10]

Defendant contends that because his case is not yet final on appeal, he is entitled to the benefit of section 1170, as amended, pursuant to the principles of retroactivity set forth in *In re Estrada*, *supra*, 63 Cal.2d 740.  Defendant argues that remand is required because it would not be "futile" in light of the trial court's failure to strongly indicate a preference for an upper term sentence.  The People agree the amendments are retroactive but argue remand is not required because, in imposing the upper term, the trial court properly relied upon a criminal conviction to which defendant admitted.  As to the other circumstances the trial court relied upon to justify an upper term, a jury would have found them true beyond a reasonable doubt.  Therefore, any error is harmless.

This court recently articulated the standard for harmless error in the Senate Bill No. 567 context.  (*People v. Dunn* (2022) 81 Cal.App.5th 394, 405–410, review granted

---

**10**    Defendant argues that he is entitled to remand because of newly enacted section 1170, subdivision (b)(6), which provides for a presumptive low term where any of the following circumstances was a contributing factor in the commission of the offense:  (1) defendant experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence; (2) defendant was 26 years or younger at the time of the offense; or (3) defendant is or was a victim of intimate partner violence or human trafficking.  However, nothing in the record suggests that any of these factors are present in defendant's case.  Thus, we cannot find defendant's sentence would be more favorable upon remand.

Oct. 12, 2022, S275655.) We apply that standard: "The reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt. If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was harmless. If not, the reviewing court moves to the second step …, (2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps. If the answer is no, the error was harmless. If the answer is yes, the reviewing court vacates the sentence and remands for resentencing consistent with section 1170, subdivision (b)." (*Id*. at pp. 409–410, fn. omitted.)

With that standard in mind, we turn to the aggravating circumstances relied upon by the trial court. As to the first, defendant admitted he had a prior serious or violent felony conviction. Thus, the first aggravating circumstance was proved in compliance with section 1170, subdivision (b)(2). The second aggravating circumstance relied upon by the trial court was defendant's egregious conduct in committing the offense. This circumstance was not submitted to the jury nor admitted by defendant and did not comply with section 1170, subdivision (b)(2). The third aggravating circumstance relied upon by the trial court was defendant's two misdemeanor convictions and the two convictions in the instant case, all incurred since successful completion of his 2002 probationary term. However, the trial court is only permitted to rely on convictions not admitted by defendant where they are proven by a certified record of conviction. This circumstance was not proved in compliance with section 1170, subdivision (b)(3) as to the 2013 and 2018 convictions.

We consider whether the second and third circumstances—although not proved in compliance with section 1170, subdivision (b)—would have been found true by the jury

30.

beyond a reasonable doubt. Because we concluded that the first aggravating circumstance was proved in compliance with section 1170, subdivision (b)(2), we need only conclude that there is no reasonable probability that the jury would not have found true beyond a reasonable doubt each remaining aggravating circumstance. (See *People v. Dunn*, *supra*, 81 Cal.App.5th at p. 409, fn. 12.)

With reference to the trial court's comment that defendant's conduct was egregious (the second circumstance), we will assume that the trial court was referring to California Rules of Court, rule 4.421(b)(1), "[t]he defendant has engaged in violent conduct which indicates a serious danger to society," as set forth in the probation officer's report. Our Supreme Court has cautioned against attempting to determine whether a jury would have found true aggravating circumstances that require "an imprecise quantitative or comparative evaluation of the facts." (*People v. Sandoval* (2007) 41 Cal.4th 825, 840.) Whether defendant posed a serious danger to society is a somewhat subjective inquiry, not capable of precise determination. Any conclusion on our part would be speculative.

With reference to the third circumstance, the probation officer's report indicates that after defendant was convicted of misdemeanor spousal abuse in 2000, he completed a diagnostic program as part of his sentence in 2002 for assault with a deadly weapon and was convicted of disturbing the peace in 2013, altering a vehicle registration in 2018, and the instant offenses. The probation officer obtained the information from the Federal Bureau of Investigation, the California Identification and Investigation Bureau, and the Department of Motor Vehicles databases and listed defendant's identification numbers within each, which served as sources of information for defendant's prior convictions. Defendant did not dispute the truth of his prior convictions at sentencing or in his motion to strike the 2002 felony conviction. There is no logical reason that defendant would not have challenged the accuracy of his prior convictions if not true. Those convictions were sufficient to support the trial court's finding that defendant's prior convictions were

31.

numerous. (See *People v. Searle*, 213 Cal.App.3d 1091, 1098 [three convictions qualify as numerous for purposes of Cal. Rules of Court, rule 421(b)(2)].) We conclude beyond a reasonable doubt that a jury would have found defendant's prior convictions true beyond a reasonable doubt.

Because we cannot conclude there is a reasonable probability that a jury would not have found the second circumstance true beyond a reasonable doubt, we must therefore determine whether there is a reasonable probability the trial court would have sentenced defendant to a sentence less than the upper term based on the first and third aggravating circumstances. We conclude there is not.

In considering an upper sentence, the trial court mentioned the egregiousness of the conduct but emphasized it "place[ed] value on the fact that [defendant] did not stay free of criminal behavior since 2002 [defendant's felony conviction for assault with a deadly weapon], although the Court did not believe that they were egregious enough to deny … the *Romero* motion, … but still they are part of his criminal history." (Italics added.) Essentially, having struck defendant's prior serious or violent felony conviction for purposes of the "Three Strikes" law, the trial court used these factors to justify the upper term. Furthermore, the trial court did not recognize any mitigating circumstances. Therefore, we conclude that even without the second aggravating circumstance, the trial court would still find that the two remaining aggravating circumstances outweigh any mitigating circumstances and there is no reasonable probability the trial court would impose a lesser sentence even without consideration of the second circumstance. This is particularly true in light of the overlap between the first and second circumstances. While a jury may not have found true that defendant posed a serious danger to society, the trial court was permitted to rely on the violent nature of defendant's prior offenses in 2000 and 2002 and the violent nature of the crimes the jury found true beyond a reasonable doubt in this case when considering whether the upper term was warranted.

In summary, we conclude there is no reasonable probability the trial court would have imposed a term less than the upper term if it had not erroneously considered the second aggravating circumstance because two of the three aggravating circumstances relied upon by the trial court in imposing the upper term were either proved in compliance with section 1170, subdivision (b) or provable on the record before us to the jury beyond a reasonable doubt, the one aggravating circumstance not provable from the record considerably overlapped with an aggravating circumstance proved in compliance with section 1170, subdivision (b)(2), and the trial court found no circumstances in mitigation. Therefore, we find the error harmless.

## DISPOSITION

The trial court is ordered to stay defendant's sentence for battery causing serious bodily injury (count 2) pursuant to section 654. The trial court shall prepare an amended abstract of judgment reflecting the change and forward it to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.


HILL, P. J.

WE CONCUR:


POOCHIGIAN, J.


PEÑA, J.


33.